# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01377-COA

JAMES MICHAEL PACE

APPELLANT/
CROSS-APPELLEE

v.

JULIE PACE

APPELLEE/
CROSS-APPELLANT

DATE OF JUDGMENT: 08/02/2019
TRIAL JUDGE: HON. DEBORAH J. GAMBRELL
COURT FROM WHICH APPEALED: FORREST COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT: MARY LEE HOLMES
ATTORNEY FOR APPELLEE: S. CHRISTOPHER FARRIS
NATURE OF THE CASE: CIVIL - DOMESTIC RELATIONS
DISPOSITION: ON DIRECT APPEAL: AFFIRMED.
ON CROSS-APPEAL: AFFIRMED -
07/27/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.    The Forrest County Chancery Court granted Julie Pace a divorce from James Michael Pace ("Michael") on the ground of adultery, granted Julie custody of the parties' son, ordered Michael to pay child support, and divided the marital estate.  On appeal, Michael argues that the chancellor erred by not compelling Julie to produce certain emails between her and her attorney, by ordering him to pay too much child support, by failing to distinguish marital property from separate property, by awarding Julie certain funds, and by giving Julie authority to sell the parties' personal property and the marital home.  On cross-appeal, Julie

argues that the chancellor should have awarded her alimony. We find no error and affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2. Julie and Michael married in 2005. Julie was married previously and has a minor daughter from her first marriage. Michael also was married previously and has a son, who is now an adult, from his first marriage. Julie and Michael have one child together, a son, who was born in 2006. In 2018, Julie filed for divorce after she discovered that Michael, a doctor, was having an affair with a nurse who worked at his medical clinic.

¶3. Michael owned his own medical clinic in Richton. Earlier in his career, he struggled with drug use, and the Mississippi Physicians' Health Program (MPHP) required him to undergo treatment for addiction.

¶4. In 2018, Michael began to smoke marijuana again. Julie disclosed Michael's renewed drug use to Scott Hamilton, the director of the MPHP. Hamilton informed Michael that in order to keep his medical license, he needed to complete a treatment program and then participate in a monitoring program. Michael completed the treatment program, but he "retired" his medical license rather than participate in the monitoring program. He testified that the monitoring program, which would include semiannual polygraph testing and random drug testing, would cost around $14,000 per year. Michael claims that he could not afford the program because Julie had taken all their money. Julie alleges that Michael wanted to quit practicing medicine, move to California, and grow marijuana with his brothers.

¶5. During the parties' marriage, Julie operated a business, Medical Nutrition Consultants, that provided administrative services to Michael's clinic. At the time of trial, Julie was

2

unemployed and looking for work.

¶6.   The parties' relationship was tumultuous from the start. Michael alleges that Julie stole money from him even before they were married, although he chose to marry her anyway. At some point during the marriage, Michael began an affair with a nurse at his clinic. In June 2018, he admitted to the affair and told Julie that he wanted a divorce.

¶7.   Michael claims that after the parties discussed divorce, Julie went to their bank and accessed a safe deposit box that held a significant amount of cash. He alleges that Julie took approximately $700,000 from the safe deposit box but then reconsidered and returned approximately half of the cash one hour later. Michael says that he then went to the bank and took the remaining $360,000. Michael put the $360,000 into the toolbox on his truck, but Julie later took the $360,000 from the toolbox.

¶8.   Julie denied that she took any money from the safe deposit box. She testified that she went to the bank after Michael admitted to his affair, but "there was nothing left in [the box]." Julie admitted that she took approximately $350,000 from the toolbox on Michael's truck. She testified that she did so because Michael was behaving erratically and had threatened to harm himself. Julie also believed that Michael had taken approximately $250,000 in cash that they kept in a safe in their home.

¶9.   There is little in the record to support either party's claims regarding their undocumented cash. Julie's initial Uniform Chancery Court Rule 8.05 statement listed a safe deposit box containing $400,000. However, in a subsequent/updated Rule 8.05 statement, Julie represented that the box contained only $150,000. Bank records show only who

accessed the box and do not show what, if anything, was removed.

¶10. After telling Julie that he wanted a divorce, Michael entered an addiction treatment center in Tennessee. Julie provided him with funds for his treatment. He remained at the treatment center for three months before returning to Mississippi.

¶11. Shortly after Michael returned to Mississippi, Julie filed a complaint for divorce based on adultery and other grounds. Michael testified that Julie told him that he "had to find another place to live," so he moved to California and applied for disability benefits based on his 2011 stroke and alleged back pain, anxiety, and insomnia.

¶12. In October 2018, Michael filed an emergency ex parte motion for an order directing Julie to return the funds from the safe deposit box or, in the alternative, deposit the funds in the court registry. Three days later, the first chancellor assigned to the case entered an ex parte order restraining Julie from using any of the funds from the safe deposit box. The case was reassigned due to the first chancellor's retirement, and the new chancellor set a hearing on Michael's motion for March 6, 2019. After listening to the parties' arguments regarding who took what and when, the chancellor dissolved the restraining order, set a new hearing for April 11, and ordered the parties to create an accounting of the disputed funds.

¶13. Both parties testified at the April 11 hearing regarding the disputed cash, and Michael's attorney examined Julie about the discrepancy between her initial Rule 8.05 statement and her updated Rule 8.05 statement. Julie testified that her initial statement that the safe deposit box contained $400,000 in cash was an error. She testified that she initially completed a Rule 8.05 statement, emailed it to her attorney, and then went to her attorney's

4

office to discuss it with him. She further stated that she could not "testify as to how all of that got confused" because she "was even confused at that point at where all the money went." Julie later testified that the $400,000 referenced in her initial statement was not all in a safe deposit box. Rather, that figure included $150,000 that she placed in a safe deposit box and $250,000 cash that she deposited in a bank account, which she accounted for. She testified that the $400,000 total derived from the money that she had removed from Michael's toolbox and additional cash (approximately $50,000) that they kept in a safe in the marital home.

¶14. Following the hearing, Michael asked the court to order Julie to produce all emails between her and her attorney regarding the relevant parts of her Rule 8.05 statements. However, the chancellor later denied Michael's request. Michael also asked the court to order Julie to share the remaining cash with him because he was "destitute." The chancellor denied that request as well, reasoning that Julie needed the funds to repair and maintain the marital home for sale and because she had custody of the parties' son.

¶15. The case proceeded to trial in June 2019. Michael admitted that he had committed adultery, and he did not oppose Julie's request for a divorce on that ground. Accordingly, the chancellor granted Julie a divorce based on uncondoned adultery.

¶16. Michael testified that he had moved to California and that he was unable to earn a living and had no income because he had retired his medical license. He testified that in order to resume practicing medicine he would need to enter into a drug monitoring program, which would cost approximately $14,000 per year. He blamed Julie for the loss of his

5

license, stating that he could not afford the monitoring program because Julie "stole [their] money." He admitted that after their separation in 2018, Julie had given him $75,000 for his addiction treatment and then another $25,000 for expenses related to his medical clinic. He used the $75,000 for his addiction treatment but then used the $25,000 to pay alimony that he owed to his first wife. He admitted that he could have used some of the $25,000 for a drug monitoring program instead. Michael stated that he had no intention of returning to the practice of medicine. He also admitted that no doctor had found that he was permanently disabled. Michael did not provide any evidence or argument concerning any separate property. He simply testified that he "want[ed] half of everything."

¶17. Julie testified she was unemployed due to the closure of Michael's clinic. She had worked as a diet/nutrition consultant to home health agencies prior to her marriage to Michael, and she was trying to find consulting work again. She was concerned about the prospect of her son going to California with Michael because Michael had told them "that he was going to go file for disability and grow marijuana." She testified that Michael's older brother was already in the marijuana business in California.

¶18. The parties' son, who was twelve years old at the time of trial, testified in chambers that he wanted to live with his mother and have visitation with his father. The chancellor granted Julie sole custody of the child and granted Michael visitation. On appeal, Michael does not raise any issue related to custody or visitation. The chancellor also ordered Michael to pay Julie $1,200 per month in child support after finding that Michael had the "capacity" to earn "substantial" income of "more than" $100,000 per year and that Michael had failed

6

to produce "any medical testimony to support his claim of disability."

¶19. The chancellor ordered the parties to sell the marital home and the medical clinic building and to sell by auction all personal property on which they could not agree. The chancellor ordered that the parties should "divide equally the proceeds" from the sale of their assets and that Michael would be responsible for half of any expenses that Julie incurred in selling the assets. The chancellor also awarded Julie the remaining cash from the safe deposit box (approximately $120,000), which she was to use to support her and her son and to pay any expenses related to the sale of the marital home and the parties' other assets.

¶20. On appeal, Michael argues that the chancellor erred by denying his motion to compel Julie to produce emails to her attorney, by ordering him to pay excessive child support, by failing to distinguish marital property from separate property, by awarding Julie the remaining cash from the safe deposit box, and by granting Julie control over the sale of the parties' assets. Julie filed a cross-appeal and argues that the chancellor erred by not awarding alimony.

## DISCUSSION

**I.      The chancellor did not abuse her discretion by denying Michael's motion to compel Julie to produce emails between her and her attorney.**

¶21. "The chancery court is afforded broad discretion in discovery matters, and we will not overturn a chancery court's decision unless there is an abuse of discretion." *Fresenius Med. Care Holdings Inc. v. Hood*, 269 So. 3d 36, 52 (¶50) (Miss. 2018). "If the chancery court applies the correct legal standard, we must affirm the decision, regardless of what any of us

individually might have ruled had we been the judge, unless there is a definite and firm conviction that the court below committed clear error." *Id.* (brackets omitted) (quoting *Newsome v. Shoemake*, 234 So. 3d 1215, 1226 (¶43) (Miss. 2017)). The application of the attorney-client privilege is "a mixed question of law and fact." *Hewes v. Langston*, 853 So. 2d 1237, 1241 (¶13) (Miss. 2003). We review the trial court's findings of fact only for clear error but review any issues of law de novo. *Id.*

¶22. The attorney-client privilege protects, inter alia, "any confidential communication made to facilitate professional legal services to the client . . . between the client . . . and the client's lawyer." MRE 502(b)(1). Michael argues that although Julie's emails to her lawyer ordinarily would be privileged, Julie waived the privilege by testifying about one of those emails and indicating that the misstatement in her initial Rule 8.05 statement resulted from a miscommunication between her and her attorney.

¶23. A client can waive the attorney-client privilege "in certain circumstances." *Jackson Med. Clinic for Women P.A. v. Moore*, 836 So. 2d 767, 771 (¶13) (Miss. 2003). If the client "voluntarily testifie[s]" regarding otherwise privileged communications, "he thereby waives the privileged character of such communications, and he and his attorney may then be fully examined in relation thereto." *Id.* (quoting *Bennett v. State*, 293 So. 2d 1, 5 (Miss. 1974), *overruled on other grounds by Triplett v. State*, 579 So. 2d 555, 559 (Miss. 1991)).

¶24. In *Moore*, a medical malpractice case, the defendant moved for summary judgment based on the statute of limitations, arguing that the statute of limitations began to run when the plaintiff's former attorney received her medical records in 1993. *Id.* at 770 (¶11). In

8

response, the plaintiff argued that her injury "was latent" until she "discovered" it in 1994. *Id.* The plaintiff stated in an affidavit and in her deposition that her prior attorney obtained her records, consulted with a physician, and then informed her in April 1993 that she had no claim against the defendant. *Id.* at 771-72 (¶¶14-15). The defendant contended that the plaintiff's testimony waived the attorney-client privilege with respect to relevant communications with her prior attorney. *Id.* at 772-73 (¶16). The Supreme Court agreed, stating that "the 'at issue,' or implied waiver, exception" to the attorney-client privilege "is invoked only when the contents of the legal advice is integral to the outcome of the legal claims of the action." *Id.* at 773 (¶20) (quoting *Metro. Life Ins. v. Aetna Cas. & Sur. Co.*, 730 A.2d 51, 52-53 (Conn. 1999)). The Court then held that the plaintiff had placed her communications with her prior attorney at issue and waived the privilege when she "specifically pled reliance on [her prior attorney's] advice as an element of her defense to [the defendant's] motion for summary judgment" and "voluntarily testified regarding communications with [her prior attorney]." *Id.* at (¶21).

¶25. In this case, Michael argues that Julie waived her privilege because she made a brief reference to an email to her attorney when attempting to explain a misstatement in her Rule 8.05 statement. Therefore, he argues that the chancellor abused her discretion by declining to order Julie to produce that email and any other relevant emails. We disagree.

¶26. The "contents" of the email that Julie referenced were not "integral to the outcome" of any legal issue in this case. *Id.* at 773 (¶20) (quoting *Metro. Life Ins.*, 730 A.2d at 52-53). Nor did Julie rely on the email to support any claim or defense in the case. *Id.* at (¶21).

9

Rather, she made only a brief reference to the email, and there is nothing to indicate that the email was of any significance. Even without the email, Michael was able to fully cross-examine Julie regarding the discrepancy between her initial Rule 8.05 statement and her updated statement. Under these circumstances, we cannot say that the chancellor abused her discretion by denying Michael's motion to compel.[1]

## II. The chancellor's child support order was not an abuse of discretion.

¶27. "[A]n award of child support is a matter within the discretion of the chancellor and . . . will not be reversed unless the chancellor was manifestly wrong in his finding of fact or manifestly abused his discretion." *Clausel v. Clausel*, 714 So. 2d 265, 266 (¶6) (Miss. 1998). "Furthermore, the process of weighing evidence and arriving at an award of child support is essentially an exercise in fact-finding, which customarily significantly restrains this Court's

---

[1] Michael also briefly argues that Julie's emails are discoverable under Mississippi Rule of Evidence 502(d)(4), which provides that the attorney-client "privilege does not apply if . . . [t]he communication is relevant to an issue about an attested document to which the lawyer is an attesting witness." This argument is without merit because Julie's Rule 8.05 statement was not an attested document, nor was her lawyer an attesting witness.

Finally, Michael briefly asserts that Julie's emails are discoverable under Mississippi Rule of Civil Procedure 26(b)(3) because he has a "substantial need" for them. This argument is without merit because Rule 26(b)(3) only addresses trial preparation materials, i.e., "work product." In narrowly limited circumstances, it permits a party to obtain discovery of trial preparation materials that are "otherwise discoverable under [Rule 26](b)(1)." M.R.C.P. 26(b)(3). Any material that is "privileged" is *not* discoverable under Rule 26(b)(1). M.R.C.P. 26(b)(1). Therefore, Rule 26(b)(3) does not provide an exception to the attorney-client privilege. *See Admiral Ins. v. U.S. Dist. Court*, 881 F.2d 1486, 1494-95 (9th Cir. 1989) ("The principal difference between the attorney-client privilege and the work product doctrine, in terms of the protections each provides, is that the privilege cannot be overcome by a showing of need, whereas a showing of need may justify discovery of an attorney's work product." (quoting Stephen A. Saltzburg, *Corporate and Related Attorney-Client Privilege Claims: A Suggested Approach*, 12 Hofstra L. Rev. 279, 299 (1984))).

review." *Id.* at 266-67 (¶6) (brackets and quotation marks omitted).

¶28. Michael argues that the chancellor erred by ordering him to pay $1,200 per month in child support because he no longer has his medical license and his income has decreased as a result. Michael claims that he cannot afford the monitoring program that would be required for him to resume practicing medicine and that he has "no other income." He argues that child support should be calculated based on his "current income" rather than what he has earned and could earn again as a doctor. We disagree.

¶29. "The chancellor can base child support on the parent's potential earning capacity." *Suber v. Suber*, 936 So. 2d 945, 949 (¶8) (Miss. Ct. App. 2006). If the non-custodial parent's "diminished earnings are the result of voluntary choice," the chancellor may order child support based on the parent's "earning capacity" rather than his actual current income. *Selman v. Selman*, 722 So. 2d 547, 555 (¶36) (Miss. 1998). The parent's "obligation to provide adequate support remains" despite his choice to earn less than he could. *Id.* (directing "the chancellor to give due consideration to [the father's] earning capacity," which was "roughly three times his present earnings," when setting child support).

¶30. Here, the chancellor found that Michael "has the ability to earn substantial income" of more than $100,000 annually. The chancellor's finding is supported by substantial evidence. Although Michael now claims that he is disabled because of a stroke he suffered in 2011, he presented no medical evidence to support his claim, and he continued to earn well in excess of $100,000 per year following his stroke. Moreover, although Michael claimed that he had to retire his medical license because he could not afford a monitoring program,

11

Julie presented evidence that she provided him with sufficient funds to pay for the program, and the division of marital assets will also provide him with sufficient assets to afford the program.[2]  Thus, there is substantial evidence to support the chancellor's finding that Michael has the capacity to return to the practice of medicine and earn more than $100,000 per year.  Although Michael's own decisions have diminished his current earnings, his "obligation to provide adequate support remains."  *Id.*  The chancellor did not abuse her discretion by basing child support on Michael's demonstrated "earning capacity" rather than his income at the time of trial.  *Id.*

###  III.  The chancellor did not "fail[] to distinguish marital property versus separate property."

¶31.   "The law presumes that all property acquired or accumulated during marriage is marital property."  *Stroh v. Stroh*, 221 So. 3d 399, 409 (¶27) (Miss. Ct. App. 2017) (citing *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994)).  "This presumption may be rebutted only if 'it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside the marriage.'"  *Id.* (quoting *Hemsley*, 939 So. 2d at 914).  "The burden of proof is on the spouse claiming property as separate to rebut this presumption."  *Rhodes v. Rhodes*, 52 So. 3d 430, 441 (¶42) (Miss. Ct. App. 2011).

¶32.   On appeal, Michael asserts that the chancellor "failed to distinguish marital property versus separate property."  However, Michael failed to raise this issue in the trial court and put on no evidence at trial to show that any property was a separate asset.  Indeed, even on

---

[2] As noted above, the chancellor ordered the parties to sell the marital home, the medical clinic building, and other assets and divide the proceeds equally.  There is no mortgage on the home, and the parties agreed that it is worth approximately $1,000,000.

12

appeal, Michael fails to identify any specific asset that he claims as separate property. Accordingly, the issue is waived. *See, e.g.*, *Burnham v. Burnham*, 185 So. 3d 358, 360 (¶10) (Miss. 2015) ("The well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision." (quoting *Mills v. Nichols*, 467 So. 2d 924, 931 (Miss. 1985))); *Doss v. Claiborne Cnty. Bd. of Supervisors*, 230 So. 3d 1100, 1104 (¶10) (Miss. Ct. App. 2017) ("In the absence of meaningful argument and citation of authority, an appellate court generally will not consider an assignment of error. A cursory argument without further reason or explanation is inadequate." (citation, quotation marks, brackets, and ellipsis omitted)).

¶33.    In addition, Michael failed to meet his burden of proving that any property was a separate asset. At trial, Michael made no attempt to identify any separate property. When the chancellor asked Michael's attorney what property Michael wanted to keep, counsel responded that Michael "just want[ed] . . . [his] guns . . . and his pictures, . . . just his personal items." Shortly thereafter, Michael stated that he "want[ed] half of everything that is over there," referring to the parties' "home" and "furniture." Because Michael "put on no proof" at trial that any asset "came from his earnings prior to or outside of the marriage or were otherwise part of his separate estate," his claim that the chancellor erred by failing to identify and award him separate property is without merit. *Yancey v. Yancey*, 752 So. 2d 1006, 1012 (¶20) (Miss. 1999).

> **IV.    The chancellor did not abuse her discretion in her equitable division of the marital estate.**

¶34.    "[T]he chancellor's discretion in the area of equitable distribution is exceedingly

broad," and the chancellor "has the flexibility to do what equity and justice requires." *In re Dissolution of Marriage of Wood*, 35 So. 3d 507, 516 (¶20) (Miss. 2010) (quoting *Hensarling v. Hensarling*, 824 So. 2d 583, 590 (¶21) (Miss. 2002)). "The equitable distribution of marital assets is committed to the discretion of the chancellor, whose findings will not be disturbed by this Court unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Jones v. Jones*, 995 So. 2d 706, 712 (¶19) (Miss. 2008) (quoting *Arthur v. Arthur*, 691 So. 2d 997, 1003 (Miss. 1997)). Furthermore, "an equitable division of property does not necessarily mean an equal division of property." *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994). "The intent of equitable distribution is to assure that after taking into account all relevant factors, including the separate estates of the parties, the contributions of each party toward the accumulation of the marital estate, and the needs of each party, to the extent reasonably possible, each party is given sufficient assets to accommodate his needs." *Wideman v. Wideman*, 909 So. 2d 140, 144 (¶14) (Miss. Ct. App. 2005).

¶35.    Michael argues that the chancellor abused her discretion by granting Julie the parties' remaining cash (approximately $120,000) and by granting "Julie all control over the sale of all real and personal property." Michael claims that the chancellor "gave no consideration to [his] inability to meet his own needs" because she did not grant him any funds immediately and because it was unknown when the parties' other "assets would be liquidated." Michael further claims that the chancellor's order "gave room for Julie to keep any marital property she saw fit that the parties contested."

¶36.    We find no abuse of discretion in the chancellor's decision to award Julie the parties' remaining cash.  As the chancellor noted, Julie needed funds to support both herself and the parties' son.  In addition, the chancellor directed Julie to pay necessary expenses to maintain and sell the marital home, the medical clinic building, and the parties' personal property. Given that Julie was unemployed and had no income, she had an immediate need for funds to meet these obligations.  In addition, as noted above, there was substantial evidence to support the chancellor's finding that Michael has a far greater earning capacity than Julie despite his voluntary choice to retire his medical license.  Under these circumstances, we find no abuse of discretion in the chancellor's award of these funds to Julie.  *See McIlwain v. McIlwain*, 815 So. 2d 476, 479 (¶9) (Miss. Ct. App. 2002) (holding that the chancellor did not abuse his discretion by awarding approximately $50,000 to the wife, rather than dividing it equally, based on evidence that the wife needed the funds to pay necessary expenses).  As noted above, "an equitable division of property does not necessarily mean an equal division of property," *Chamblee*, 637 So. 2d at 863-64, and Michael will receive a significant distribution through the sale of the other marital assets.

¶37.    We also find no merit to Michael's complaint that the chancellor gave "Julie all control over the sale of all real and personal property."  The parties agreed that the marital home and the medical clinic building should be sold.  In addition, as discussed above, Michael never presented any specific evidence regarding personal property that he claimed or desired to keep.  The final judgment simply directed Julie to hire a realtor to sell the marital home and to hire an auctioneer to sell any personal property that "the parties can not

15

agree upon." The chancellor's order does not by its terms grant Julie total control over those assets but merely directs her to make necessary preparations for their sale. We find no abuse of discretion in the chancellor's assignment of this responsibility to Julie, particularly since Michael had relocated to California.

**V. The chancellor did not abuse her discretion by not awarding alimony.**

¶38. "It is hornbook law that whether to award alimony and the amount to be awarded are largely within the discretion of the chancellor." *Gutierrez v. Gutierrez*, 233 So. 3d 797, 811 (¶33) (Miss. 2017) (quoting *Creekmore v. Creekmore*, 651 So. 2d 513, 517 (Miss. 1995)). "Alimony is considered only after the marital property has been equitably divided and the chancellor determines one spouse has suffered a deficit." *Lauro v. Lauro*, 847 So. 2d 843, 848 (¶13) (Miss. 2003). When we refer to a "deficit," we mean that "the spouse seeking alimony is left 'with a deficit with respect to having sufficient resources and assets to meet his or her needs and living expenses.'" *Layton v. Layton*, 181 So. 3d 275, 282 (¶17) (Miss. Ct. App. 2015) (emphasis omitted) (quoting *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013)). "If after the equitable distribution of the marital property, both parties have been adequately provided for, then an award of alimony is not appropriate." *Cosentino v. Cosentino*, 912 So. 2d 1130, 1132 (¶10) (Miss. Ct. App. 2005).

¶39. On the facts of this case, we cannot say that the chancellor abused her discretion by not awarding alimony to Julie. The chancellor's division of the marital property not only provided Julie with $120,000 immediately but also awarded her half of the proceeds from the sale of assets valued at more than $1,000,000. In addition, although Julie was unemployed

16

at the time of trial, she is a college graduate and a Registered Dietitian Nutritionist/Licensed Dietitian, and she was only forty-three years old and in good health at the time of trial. On appeal, Julie asks us to reverse and remand the case for the chancellor to consider alimony because—at least as of the date of Julie's brief—"the marital home and the medical clinic have not been sold," and Michael's "medical license has been reinstated." However, these facts are not in the record. "Factual assertions . . . in appellate briefs are not evidence and will not be used as grounds for reversing the trial court's judgment." *Abercrombie v. Abercrombie*, 193 So. 3d 680, 683 (¶9) (Miss. Ct. App. 2016). "This Court may not act upon or consider matters which do not appear in the record and must confine itself to what actually does appear in the record." *Copeland v. Copeland*, 235 So. 3d 91, 97 (¶17) (Miss. 2017) (quoting *Shelton v. Kindred*, 279 So. 2d 642, 644 (Miss. 1973)). Based on the evidence presented at trial, we cannot say that the chancellor abused her discretion by not awarding alimony.

## CONCLUSION

¶40.    Neither Michael nor Julie identifies any reversible error or abuse of discretion in the chancellor's rulings. Therefore, we affirm the final judgment of divorce in its entirety.

¶41.    **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**